UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAMAR BURTON,

    Plaintiff,

v.

MICHIGAN DEPARTMENT OF
CORRECTIONS, *et al.*,

    Defendants.
_____/

Case No. 1:20-cv-854

Hon. Paul L. Maloney

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought pursuant to 42 U.S.C. § 1983 by plaintiff Lamar Burton, a state prisoner in the custody of the Michigan Department of Corrections (MDOC). While plaintiff is presently incarcerated at the MDOC's Ionia Correctional Facility (ICF), the events about which he complains occurred at the Michigan Reformatory (RMI). Plaintiff sued the MDOC and several individuals who work at RMI: Warden Skipper, Corrections Officer (CO) [Timothy] Field, Program Manager Breedlove, Inspector Bonn, Grievance Coordinator [Sarah] Wellman, Psychologist Mark Fox, and Dr. Kirtida Patel. Compl. (ECF No. 1). This matter is now before the Court on defendants Field and Fox's motion for summary judgment for failing to exhaust administrative remedies (ECF No. 23).

    **I.**    **Background**

The Court summarized plaintiff's claims against defendants Field and Fox in pertinent as follows:

1

Plaintiff alleges that on October 17, 2019, fellow inmate Peake, a gang member, savagely attacked Plaintiff, damaging Plaintiff's eye. Plaintiff contends that Defendant Field witnessed the attack and did nothing to stop it. Plaintiff claims that Field allowed Peake to come into Plaintiff's cell, closed the gate, and then opened it again for Peake after he had finished beating Plaintiff. Plaintiff reports that Peake and his fellow gang members told Plaintiff that [sic] would stab him if he "snitched."

The next day, other corrections officers noticed Plaintiff's bandaged eye. Officer Olezkiewizc examined Plaintiff's eye and called the sergeant over. The sergeant walked Plaintiff to healthcare and then back to the officer's station. On the way, inmate Peake and his fellow gang members warned Plaintiff against snitching or he would be stabbed. The sergeant watched the video of the incident and told Plaintiff that he had. Fearing for his life, Plaintiff told the sergeant that he had been bitten by a spider.

The sergeant clearly did not believe Plaintiff's story. He called out inmate Peake, placed him in handcuffs, and took him to segregation. Thereafter, Plaintiff was constantly bullied by members of Peake's gang. He was invited to join them or be stabbed. Eventually Plaintiff joined the gang. For a few weeks, Plaintiff moved contraband for the gang. He did what he was told out of fear for his own safety and the safety of his family.

On January 8, 2020, inmate Peake ordered Plaintiff to stab inmate Throneberry for an unpaid drug debt. Plaintiff claims that on January 10, 2020, Defendant Field let Plaintiff out of his cell to permit Plaintiff to carry out Peake's order. Plaintiff stabbed Throneberry several times.

Plaintiff was put on room confinement/toplock. Plaintiff contends he should have gone to segregation or been transferred. Inmate Peake ordered Plaintiff to stab another inmate.

Plaintiff suffers from mental disorders including PTSD, paranoia, and bipolar. Following the January 10 stabbing incident he was unable to sleep. He sent in healthcare requests. On January 15, 2020, he saw Defendant Fox and informed Fox what had happened. Fox brought Plaintiff to Defendant Bonn. Plaintiff explained everything to Defendant Bonn. Bonn asked if Plaintiff had more weapons. Plaintiff acknowledged that he did. Unit staff shook down Plaintiff's cell and found two stabbing implements. Plaintiff was taken to segregation.

In the two weeks that followed, Plaintiff sent several kites to mental health services. Defendant Patel told Plaintiff on January 23, 2020, that he had an appointment to see the doctor the next week. On January 28, however, Plaintiff was told to pack up for transfer to a different facility. The next night, he attempted

2

> suicide by hanging and slashing his wrist. He was taken to Ionia Hospital. Upon his return, he was placed on suicide watch. Plaintiff was seen by an unknown doctor on February 3 and prescribed new medication. On February 12, 2020, Plaintiff was transferred to Ionia.
>
> Plaintiff was on modified access to the administrative grievance procedure during the period he describes in his complaint. Several times over the course of this five-month period, Plaintiff sent requests to Defendant Wellman for grievance forms. Wellman routinely refused. . . .

Opinion (ECF No. 5, PageID.96-98).

The Court dismissed all of plaintiff's claims except the 8th Amendment claims against defendant Fields for deliberate indifference to plaintiff's health and safety, and the 8th Amendment claims against defendants Fox and Dr. Patel for their deliberate indifference to plaintiff's serious mental health needs following his placement in segregation on January 15, 2020. *Id*. at PageID.114-115.

## II. Defendants' motion for summary judgment

### A. Legal standard for summary judgment

Defendants Field and Fox seek summary judgment on the ground that plaintiff failed to exhaust his administrative remedies prior to filing this lawsuit. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B. Failure to Exhaust

#### 1. Exhaustion requirement

The PLRA provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This

> has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218. Finally, even if a prisoner complies with the grievance procedures, the grievance must give fair notice of the misconduct or mistreatment as measured against the claim alleged in the prisoner's complaint. *See Bell v. Konteh*, 450 F.3d 651, 654 (6th Cir. 2006).

### 2. MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective March 18, 2019). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ Q. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ Q and S. The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ S (emphasis in original). The prisoner must send the Step I grievance to the appropriate

grievance coordinator. *Id.* at ¶ W. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ DD. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ HH.

### 3. Discussion

Defendants reviewed plaintiff's extensive grievance history as set out in an MDOC Step III Grievance Report (ECF No. 24-3, PageID.208-231). The Report listed over 90 grievances. Defendants identified 13 grievances which plaintiff pursued through Step III during the relevant time period (October 2019 through January 2020). Defendants' Brief (ECF No. 24, PageID.184-185). None of the grievances involved plaintiff's claims against defendants Field or Fox. In short, there is no evidence that plaintiff properly exhausted any grievances against these two defendants through Step III.

In his response, plaintiff contends that defendants prevented him from exhausting grievances because they ignored five requests for grievances which he submitted while on "modified access." *See* Plaintiff's Response (ECF No. 32).[1] When a prisoner abuses the grievance process, the Manager of the Grievance Section may limit the prisoner's ability to file grievances by placing the prisoner on modified access pursuant to Policy Directive 03.02.130 ¶ JJ which provides as follows:

---

[1] The Court notes that on March 24, 2021, plaintiff filed a supplement to his response which he entitled "Plaintiff's motion for prospective relief 18 U.S.C. § 3626(h). Definitions [ . . .] Appropriate remedies with respect to prison conditions. (a) Requirements for relief, below. This motion is in support of plaintiff motion opposing defendants' summary judgment motion" (ECF No. 45). The Court has not considered this untimely "supplement, which does not address the exhaustion issue.

> A prisoner or parolee who files an excessive number of grievances (three within a 30 calendar day span) that are rejected or the prisoner is found guilty of misconduct for filing an unfounded grievance as set forth in Paragraph M, may have access to the grievance process limited by the Warden or FOA Region Manager for an initial period of not more than 90 calendar days. If the prisoner or parolee continues to file such grievances while on modified access, the Warden or FOA Region Manager may extend the prisoner's or parolee's modified access status for not more than an additional 30 calendar days for each violation. A recommendation to place a prisoner on modified access shall be submitted only by the Grievance Coordinator or the Grievance Section Manager and shall include a list of the grievances forming the basis for the recommendation and the reason for the recommendation.
>
> A prisoner on modified access may file grievances if he complies with the following

procedure:

> While on modified access, the prisoner or parolee shall be able to obtain grievance forms only through the Step I Grievance Coordinator. A grievance form shall be provided if the Step I Grievance Coordinator determines that the issue the prisoner or parolee wishes to grieve is grievable and otherwise meets the criteria outlined in this policy. The Grievance Coordinator shall maintain a record of requests received for grievance forms and whether the request was approved or denied and, if denied, the reason for the denial. If a prisoner or parolee on modified access attempts to file a grievance using a form not provided by the Grievance Coordinator, the Grievance Coordinator may reject the grievance in accordance with Paragraph J. The Warden, FOA Region Manager, or Manager of the Grievance Section may extend the prisoner's or parolee's modified access status for not more than an additional 30 days for each violation. Notification of such extensions shall be consistent with the requirements set forth in Paragraphs KK and LL.

Policy Directive 03.02.130 ¶ MM. If plaintiff followed the procedure set out in ¶ MM, and his request for a particular grievance was denied, then "that would be the end of possible administrative remedies with regard to that grievance, and a court would thus have jurisdiction to hear a related federal claim, since all possible administrative remedies would have been attempted." *Walker v. Michigan Department of Corrections*, 128 Fed. Appx. 441, 446 (6th Cir. 2005).

7

As discussed below, plaintiff was on modified access from September 12, 2019, to December 12, 2019; off modified access from December 13, 2019, to January 7, 2020; and back on modified access from January 10, 2020, to April 10, 2020. *See* Affidavit of former defendant Sarah Wellman (ECF No. 39-2, PageID.375-376). Plaintiff contends that he sent five grievance requests while on modified access and offered copies of kites he claims to have submitted.

In a Kite dated October 21, 2019 (Kite #1), plaintiff requested a grievance against CO Field for allowing an inmate named "Zoo" [Peake] to physically assault plaintiff on October 17, 2019. *See* Kite #1 (ECF No. 1-30, PageID.46).

In a Kite dated January 13, 2020 (Kite #2), plaintiff requested a grievance against CO Field for allowing plaintiff to leave his cell and stab inmate Throneberry on January 10, 2020. *See* Kite #2 (ECF No. 1-31, PageID.47).

In a Kite which may have been dated January 22, 2020 (Kite #3), plaintiff requested a grievance against Psychologist Fox and Inspector Bonn

> to give their statements of what I gave actual knowledge of on 1/15/20. They both sent statements that were minimizing to the truth . . . I request statements due to a possession of a weapon [.]

*See* Kite #3 (ECF No. 28-1, PageID.44). It appears that plaintiff may be referring to a statement which plaintiff made to defendant Fox related to misconduct. *See* Fox email (Jan. 21, 2020) (ECF No. 1-19); Contraband removal record (listing two "prison made weapons" in plaintiff's cell on January 15, 2020) (ECF No. 1-12).

In a Kite dated January 24, 2020 (Kite #4), plaintiff asked to file a grievance against former defendant Grievance Coordinator Wellman because she was not answering his kites. *See*

8

Kite #4 (*Id*.). Kite #4 is directed against a dismissed defendant and is irrelevant to the pending claims.

Finally, in a Kite dated February 4, 2020 (Kite #5), plaintiff asked to file a grievance against defendants Dr. Patel and Mark Fox for failing to "to provide proper care w/o excessive delay [which] could of prevented my suicide attempt of 1/29/20." *See* Kite #5 (ECF No. 1-44, PageID.66).

Plaintiff seeks to corroborate his claim through two "affidavits". In one affidavit, plaintiff states that "I had my own style of serving my kites upon MDOC officials", using grievance forms which received from his "block rep" as carbon paper. *See* Plaintiff's Aff. (ECF No. 32-1, PageID.332). Presumably, this affidavit explains why plaintiff can produce copies of Kite ##s 1, 2, 3 and 5. In another affidavit, plaintiff states that former defendant Wellman would "deliberately not answer" grievance requests filed against RMI staff. *Id*. at PageID.333.

Plaintiff's "affidavits" are neither affidavits nor declarations under 28 U.S.C. § 1746 ("Unsworn declarations under penalty of perjury"). While plaintiff refers to his papers as "affidavits" they do not include a notary jurat. *See* M.C.L. § 55.265(a) ("'Jurat' means a certification by a notary public that a signer, whose identity is personally known to the notary public or proven on the basis of satisfactory evidence, has made in the presence of the notary public a voluntary signature and taken an oath or affirmation vouching for the truthfulness of the signed record."). "The absence of a jurat or other evidence of verification requires a finding that the document fails to constitute an affidavit." *Knobloch v. Langholz*, No. 231070, 2002 WL 1360388 at *2 (Mich. App. June 21, 2002) (unpublished), citing *Merrifield v. Village of Paw Paw*, 274 Mich. 550; 265 N.W. 461 (1936). "A purported affidavit, on which perjury could not be assigned

9

if it was willfully false, would not, in law, be an affidavit at all." *Kelley v. City of Flint*, 251 Mich. 691, 696; 232 N.W. 407 (1930).

In addition, plaintiff's affidavits contain inconsistent statements. While plaintiff states that the affidavits are based on "knowledge and belief" (PageID.332-333), he also included a self-styled attestation clause loosely based on 28 U.S.C. § 1746, *i.e.*, "I Lamar Burton will attest to thee [sic] above facts under the Penalty of Perjury in open court that all thee [sic] above is true § 1846 [sic]." *See* Plaintiff's Affs. (PageID.332-333). Plaintiff cannot create a genuine issue of material fact based on "knowledge and belief". *See Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015) (a court may not consider statements made on "belief" or information and belief" in deciding a summary judgment motion); Fed.R.Civ.P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Here, even if the Court considered plaintiff's self-styled attestation clause as a declaration under § 1746, his affidavits are not admissible evidence for purposes of summary judgment because they do not specify which statements were made upon knowledge and information and which were made from personal knowledge. *See Tenneco Automotive Operating Co. v. Kingdom Auto Parts*, 410 Fed. Appx. 841, 848 (6th Cir. 2010).

Furthermore, the relevant portion of plaintiff's affidavits -- that former defendant Wellman would "deliberately not answer" his grievance requests -- is insufficient to defeat a motion for summary judgment. *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual

dispute that will defeat summary judgment."). Accordingly, plaintiff has not established a genuine issue of material fact with respect to the exhaustion of grievances.

Defendants recognized plaintiff's theory of exhaustion in their reply brief, which included a 109-page affidavit from former defendant Wellman setting out plaintiff's grievance filing history in detail:

> 6.    In preparing this affidavit, I reviewed the Modified Access Status Memo from Macomb Correctional Facility (MRF) for Prisoner Lamar Burton, #495156 (Attachment B), Mr. Burton's Modified Access Status Memo for RMI Attachment C), the seventeen grievances Mr. Burton filed (and I processed) when he was at RMI (Attachment D), and the three kites I received from Mr. Burton requesting Step I grievance forms while he was on modified access status (Attachment E).
>
> 7.    Mr. Burton transferred from MRF to RMI on September 10, 2019.
>
> 8.    Shortly before Mr. Burton's transfer to RMI, he was placed on modified access status for a period of 90 days, from September 12 to December 12, 2019 (Attachment B at 1).
>
> 9.    Between September 12 and December 12, 2019, Mr. Burton filed eight Step I grievances (Attachment C at 4) and submitted three kites requesting Step I grievance forms (Attachment E). I rejected six of these eight Step I grievances because he did not obtain the Step I grievance forms from me (Attachment C at 4; Attachment D at 5-8, 10-13, 15-17, 19- 21, 23-26, and 32-35). I rejected two requests for grievance forms, October 1, 2019 (Attachment E at 1), and December 1, 2019 (Attachment E at 3); and granted one request, November 18, 2019 (Attachment E at 2).
>
> 10.    After Mr. Burton's modified access status ended, he filed eight Step I grievances between December 13, 2019, and January 7, 2020; I rejected six of these eight grievances because they did not comply with MDOC P.D. 03.02.130 (Attachment C at 4; Attachment D at 37-41, 43-50, 56-59, 61-63, 65-69, and 71-74).
>
> 11.    On January 10, 2020, Mr. Burton was placed back on modified access status for a period of 90 days, from January 10 to April 10, 2020 (Attachment C). After Mr. Burton was placed back on modified access status, he did not send me any kites requesting Step I grievance forms before his transfer from RMI.

12. Mr. Burton transferred from RMI to Ionia Correctional Facility (ICF) on February 12, 2020.

13. At all times, I processed all Step I grievances and kites requesting Step I grievance forms according to MDOC P.D. 03.02.130. If I received a kite requesting a Step I grievance form from Mr. Burton during the time periods he was on modified access status, I would have responded to the kite and kept a record of it according to MDOC P.D. 03.02.130.

Wellman Aff. (ECF No. 39-2, PageID.375-376).

In her affidavit, Ms. Wellman does not identify receiving or rejecting plaintiff's Kite #1 (October 21, 2019), Kite #2 (January 13, 2020), Kite #3 (January 22, 2020) or Kite #5 (February 4, 2020). In short, there is no evidence that he sent Kite ##s 1, 2, 3 and 5 to Ms. Wellman or that Wellman improperly rejected such grievances.

Based on this record, plaintiff did not properly exhaust a grievance against either defendant CO Timothy Field or defendant Psychologist Mark Fox. *See* Policy Directive 03.02.130 ¶ MM; *Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. Accordingly, defendants' motion for summary judgment should be granted.

### IV. Recommendation

For the reasons set forth above, I respectfully recommend that defendants Field and Fox's motion for summary judgment (ECF No. 23) be **GRANTED**.

Dated: August 17, 2021            /s/ Ray Kent
                                  RAY KENT
                                  United States Magistrate Judge


**ANY OBJECTIONS** to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).